FIKSE & COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–250C.

United States Claims Court.

May 30, 1991.

Michael J. Goergen, Washington, D.C., for plaintiff. Joseph L. Steinfeld, Jr., Robert B. Walker and John T. Siegler, of counsel.

Lisa B. Donis, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen and Sharon Y. Eubanks, Washington, D.C., for defendant. Ralph J. May, Defense Logistics Agency, of counsel.

## OPINION

BRUGGINK, Judge.

This action raises the issue of whether a bill of lading creates a contractual relationship between the Government as consignee and a private motor contract carrier. Pending are the defendant's motion to dismiss for lack of subject matter jurisdiction and the parties' cross-motions for summary judgment. Argument is deemed unnecessary. The court concludes for the following reasons that defendant's motion for summary judgment is due to be granted.

## FACTUAL BACKGROUND

The United States, acting through the Defense Industrial Plant Equipment Center, entered into contract No. DLA002–88–D–2005 with Defense Technologies, Inc.

("DTI") of Layton, Utah. The Equipment Center is a primary field activity of the Defense Logistics Agency ("DLA"). The relevant government activities will be referred to in this opinion as those of DLA. By the terms of the contract (a one-year requirements contract) DTI agreed to manufacture cleated fiberboard boxes at its Ontario, California facility and deliver them to DLA's Defense Depot in Memphis, Tennessee. DLA was to pay DTI for the costs of shipping the boxes.

On December 1, 1988, DTI contracted with plaintiff Fikse & Company ("Fikse"), a private motor contract carrier. This contract obligated Fikse to ship the boxes manufactured by DTI from its Ontario, California facility, to DLA's Defense Depot in Memphis, Tennessee. Fikse was to be paid by DTI. DLA was not a party to this contract. As deliveries commenced, Fikse presented either a bill of lading or a memorandum for each shipment received in Memphis by a DLA warehouseman, who in turn signed for receipt of the goods. Fikse's last shipment was delivered on April 11, 1989.

On July 11, 1989, DTI filed for bankruptcy. As of that date, DLA had paid DTI for every shipment of boxes received except for $3,920.19 on Delivery Order Number 3, and Fikse had been paid by DTI for all but the last nine shipments transported to Memphis ($19,273.16). DLA received notice from Fikse concerning the unpaid freight charges, and bills for each of the nine unpaid shipments on November 21, 1989.

Plaintiff alleges that defendant is liable for the nine unpaid shipping charges because defendant, as the named consignee on the bills of lading, accepted the freight delivered by plaintiff. Defendant has moved for dismissal for lack of subject matter jurisdiction, or in the alternative, for summary judgment. Plaintiff has cross-moved for summary judgment.

## DISCUSSION

■ The Government's argument that it was not in privity of contract with Fikse addresses the merits of plaintiff's case rather than a lack of subject matter jurisdiction, and hence should not be addressed under RUSCC 12(b)(1), but should be addressed under either RUSCC 12(b)(4) or RUSCC 56. *See Metzger, Shadyac & Schwartz v. United States*, 10 Cl.Ct. 107, 109 (1986). The court has considered the materials attached to the motion papers and will thus treat the case as submitted for disposition under RUSCC 56.

■ It must be emphasized that defendant in this action enjoys a unique status as the sovereign. Insofar as relevant here, the Government cannot be held liable for nonpayment of money unless the claim arises out of "a particular provision of law," *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967), or out of a contract between the parties. *Thomas Funding Corp. v. United States*, 15 Cl.Ct. 495, 499 (1988); *see Baudier Marine Elecs., Sales and Serv., Inc. v. United States*, 6 Cl.Ct. 246, 249 (1984), *aff'd*, 765 F.2d 163 (Fed.Cir. 1985) (table). With respect to contractual liability, the waiver of immunity extends only to express or implied in fact contracts. Liability cannot be implied as a matter of law merely because of the relationship of the parties. The Supreme Court has made it clear that "[t]he Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law." *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). Similarly the Court has not permitted recovery against the United States on a theory of unjust enrichment, but has required "the existence of a contract express or implied in fact." *Sutton v. United States*, 256 U.S. 575, 581, 41 S.Ct. 563, 565, 65 L.Ed. 1099 (1921).

■ For there to be liability (other than as a result of a statute, regulation or the Constitution) there must be circumstances from which a consensual agreement or meeting of the minds can be inferred. *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 598, 43 S.Ct. 425, 427, 67 L.Ed. 816 (1923). An implied in fact

contract, moreover, must contain all the elements of an express contract, namely, mutuality of intent, offer and acceptance, and actual authority to bind the Government in contract by the officer whose conduct is relied upon. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Fikse candidly admits that it has no express contract with the Government for shipping services, but argues that the Government's acceptance of the bill of lading creates an implied in fact contract which establishes the necessary privity between it and the Government. Fikse begins its analysis by citing *Southern Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 343, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982) (quoting *Texas & Pac. R.R. v. Leatherwood*, 250 U.S. 478, 481, 39 S.Ct. 517, 518, 63 L.Ed. 1096 (1919)), for the proposition that "[e]ach [term of the bill of lading] has in effect the force of a statute, of which all affected must take notice." This observation is inapposite, however, since the bill of lading merely defines the terms under which the goods are shipped. The fact that the consignee must take notice of rate and payment terms for the delivery does not mean that a contractual obligation springs up in the consignee to pay shipping charges in the absence of an agreement by it to do so. Traditionally, the bill of lading was viewed as a basic transportation contract between the carrier and the shipper-consignor, not the consignee. *Commercial Metals*, 456 U.S. at 342, 102 S.Ct. at 1820.

Fikse argues, however, that if the consignee accepts the goods without requiring that the bills of lading be marked "prepaid" as to shipping, it is the act of accepting the goods and the bill of lading which obligates the consignee to pay freight charges. The authority cited by Fikse, *New York Cent. & Hudson River R.R. v. York & Whitney Co.*, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016 (1921), does not support this proposition, however. In *York & Whitney* the consignee had apparently been consistently paying for the goods upon arrival, including shipping charges. The carrier had been charging less than the uniform shipping rates established by law, and subsequently brought suit against the consignee for the remainder. The Court held that under those circumstances, the consignee was bound to the carrier for all freight charges at the lawful rate since "[t]he transaction between the parties amounted to an assumption by the consignee to pay the only lawful rate." 256 U.S. at 408, 41 S.Ct. at 510. *York & Whitney* thus differs materially from the case at bar because the consignee there had already been paying freight charges to the carrier. The issue did not turn on who was to pay freight charges, but whether there were any additional charges lawfully due beyond those already paid by the consignee. The fact that bills of lading were used did not appear to enter into the Supreme Court's analysis.

Fikse next contends that the Government's liability is supported by a "general rule" reflected in section 10744 of the Interstate Commerce Act, which states in part:

> When the shipper or consignor instructs the carrier transporting the property to deliver it to a consignee that is an agent only, not having beneficial title to the property, the consignee is liable for rates billed at the time of delivery for which the consignee is otherwise liable, but not for additional rates that may be found to be due after delivery if the consignee gives written notice to the delivering carrier before delivery of the property—
>
> (A) of the agency and absence of beneficial title; and
>
> (B) of the name and address of the beneficial owner of the property if it is reconsigned or diverted to a place other than the place specified in the original bill of lading.

49 U.S.C. § 10744(a)(1) (1989).

By its own terms this section does not apply to the present circumstances, since it imposes liability only "when the transportation is provided by a rail, motor, or water *common* carrier under this subtitle." *Id.* (emphasis added). Common carriers are

those which provide transportation to the public for compensation under no express agreement or contract, as distinguished from contract carriers. *See* 49 U.S.C. §§ 10102(14), 10102(15). Section 10744 thus does not purport to govern those circumstances in which there exists an ongoing contract covering freight charges. This distinction is supported, as defendant argues, by cases rejecting an interpretation of section 10744 which would create liability in the consignee in the face of an express contractual allocation elsewhere of freight charges. *See In re Roll Form Prods.*, 662 F.2d 150, 153–54 (2d Cir.1981); *Consolidated Freightways Corp. v. Admiral Corp.*, 442 F.2d 56, 62 (7th Cir.1971); *In re Penn–Dixie Steel Corp.*, 6 B.R. 817, 820 (S.D.N.Y.1980), *aff'd*, 10 B.R. 878 (S.D.N.Y.1981); *cf. Southern Pac. Transp. Co. v. Campbell Soup Co.*, 455 F.2d 1219, 1220–22 (8th Cir.1972) (the principal purpose of the Interstate Commerce Act was to eliminate all forms of rate discrimination on interstate shipments). In *Roll Form*, the court held:

> The [Interstate Commerce] Act, in our view, was not intended to "fashion a sword" to insure collection by carriers of freight charges. Nor do we think the Act was intended to impose an absolute liability upon consignees for freight charges. Its sole purpose was "to secure equality of rates to all and to destroy favoritism."

*Roll Form*, 662 F.2d at 154 (quoting *Penn–Dixie Steel*, 6 B.R. at 820). Defendant correctly argues that these cases support its position because the contract between DTI and Fikse obligated DTI to pay the freight charges.

Plaintiff counters that *Roll Form* is materially different from the case at bar because the bills of lading in that case were marked "prepaid" as to shipping charges. Unless the bills of lading were marked "prepaid," plaintiff argues, "the Government cannot extricate itself from the general rule that a consignee is liable for freight charges when he accepts goods from a carrier." Brief of January 17, 1991 at 9. Plaintiff dismisses *Consolidated*

*Freightways* and *Campbell Soup Co.* in similar fashion.

To consider *Roll Form* first, the court in that case stated three possible bases from which to proceed with its analysis. Although one was the circumstance that the bills of lading were marked "prepaid" as to freight charges, the court stated that it was unnecessary to address that fact. *Roll Form*, 662 F.2d at 153. The controlling circumstance in *Roll Form*, as in our case, was that the consignor had an express contract with the carrier to pay the freight charges, resulting in that court's holding that the consignees were not liable.

Although the decisions in *Consolidated Freightways* and *Campbell Soup Co.* held that the plaintiff-carrier is estopped from its claim against the consignee for freight charges because the consignee reimbursed the consignor for freight charges in reliance upon the "prepaid" notation, they do not stand for the conclusion that the consignee is always liable in the absence of the "prepaid" notation. The more appropriate conclusion in light of these cases, the *Roll Form* case, and the use of the term "common carrier" in 49 U.S.C. § 10744, is that liability allocation presumptions are unnecessary in the face of other provisions for payment. In the present case there was another provision for payment of shipping charges, the contract between DTI and Fikse.

The court finds that acceptance of goods under the circumstances here did not constitute a "meeting of the minds" between DLA and Fikse that the Government would assume DTI's obligation to pay freight charges. Even assuming that authorized persons were aware of the acceptance of the deliveries, no implication of an agreement to pay could arise by acceptance in view of the express provisions obligating DTI to pay shipping charges. Finding liability on the basis of the non-contractual relationship between the parties exceeds the waiver of sovereign immunity.

## CONCLUSION

For the reasons expressed above, the court denies plaintiff's motion for summary

judgment and defendant's motion to dismiss, and grants defendant's motion for summary judgment.*

---

* This ruling renders consideration of defendant's argument concerning estoppel unnecessary.