**SCHNEIDER NATIONAL CARRIERS, INC., and Schneider Transport, Inc., Plaintiffs,**

v.

**RUDOLPH EXPRESS COMPANY, INC., Northwest Transport Service, Inc., and Wren, Inc., d/b/a Lakeville Motor Express, Defendants.**

**Civ. A. No. 93–C–816.**

United States District Court, E.D. Wisconsin.

June 15, 1994.

---

**DECISION AND ORDER**

REYNOLDS, District Judge.

In this action, two jointly owned interstate trucking companies, plaintiffs Schneider National Carriers, Inc., and Schneider Transport, Inc. (collectively, "Schneider"), claim that defendants, also interstate trucking companies, are liable as consignees for freight charges arising out of deliveries Schneider made to them. The parties have filed cross motions for summary judgment. For reasons set forth below, defendants' motion will be granted and Schneider's motion denied.

Jurisdiction in this court is based upon 28 U.S.C. §§ 1331, 1337.[1]

### I. Facts

In the early 1980s, the defendant trucking companies—Rudolph Express Company, Inc., Northwest Transport Service, Inc., and Wren, Inc., d/b/a LakeVille Motor Express— entered into separate "interline" or "interchange" agreements with St. Johnsbury Trucking, Inc. ("St. Johnsbury"), an interstate trucking company operating primarily in the eastern United States. Under the agreements, known collectively as the Sunpath service, St. Johnsbury would transport "less-than-truckload" shipments originating in the east to its own eastern distribution terminals, combine the shipments into full truckloads, and transport them to defendants' respective distribution terminals. Defendants would then separate each truckload shipment into its original less-than-truckload components and transport these to final destinations in their respective operating regions throughout the country.

Originally, the Sunpath shipments were delivered from St. Johnsbury's terminals to defendants' terminals by rail, but in 1983 a trucking company began performing the service. In 1987, St. Johnsbury solicited bids from other companies, and Schneider was the successful bidder. Schneider and St. Johnsbury established rates for transportation between St. Johnsbury's terminals and defendants' terminals, the rates were filed as a

Joseph M. Nicks, Godfrey & Kahn, Milwaukee, WI, for plaintiffs.

John L. Bruemmer, Richard L. Schmidt, Boardman, Suhr, Curry & Field, Madison, WI, Leslie R. Kehl, Jones & Keller, Denver, CO, for defendants.

1. This action was removed to this court from the Brown County, Wisconsin, Circuit Court on August 4, 1993.

tariff with the Interstate Commerce Commission ("the Commission"), and it was orally agreed that Schneider would bill St. Johnsbury in accordance with the tariff after the shipments were delivered to defendants' terminals. (Feb. 11, 1994 Def. St. of Facts ¶ 18; Feb. 1, 1994 Roberge Aff. ¶¶ 10, 12; Mar. 8, 1994 Pl. Resp. to Def. St. of Facts ¶ 3; Mar. 8, 1994 Stoffel Aff. ¶ 3 (noting that Schneider and St. Johnsbury never entered into a "written agreement").)

Defendants were not party to Schneider's agreement with St. Johnsbury, and Schneider was not party to the interline agreements between St. Johnsbury and defendants. Schneider, however, does not deny that "the details of the Sunpath plan were thoroughly explained" to it. (Feb. 11, 1994 Pl. St. of Facts ¶ 15.[2])

When Schneider's drivers picked up a trailer from one of St. Johnsbury's terminals, they would sign a one-page St. Johnsbury document entitled "Sunpath Bill of Lading," which listed the location of the St. Johnsbury terminal, the name and location of one of the instant defendants—identified as "consignee"—various reference numbers, and the date and time of the driver's departure. (Feb. 11, 1994 Def. Br., App. A, Ex. D.) The document specified that one of its four copies was to be left at the St. Johnsbury terminal and that the other three were to accompany Schneider's driver to the terminal of whichever company was identified as consignee; one of these copies was to be left at the company's terminal, another was to serve as the driver's receipt, and the third was to "return with invoice" to St. Johnsbury. *Id.*

Thus, upon arrival at the company's terminal, Schneider's driver would present the Sunpath Bill of Lading (along with a packet of other documents) to a representative of the company. (Jan. 31, 1994 Jensen Aff. ¶ 9.) The representative would inspect the trailer, indicate on the document whether the shipment was "intact," and sign the document on behalf of the company on a line marked "consignee." *Id.* Schneider would then submit the document to St. Johnsbury along with an invoice, which typically was issued about a week after the delivery date. (Feb. 8, 1994 Kester Aff. ¶ 4; *Id.*, Exs. A, B, C.)

The Sunpath forms labelled as bills of lading were distinct from the bills of lading covering each of the individual less-than-truckload shipments. On the latter documents, the final recipient of the shipment was designated as consignee and one of defendants as carrier. The Sunpath bill-of-lading forms differed as well from the industry's standard bill-of-lading form. A principle difference is that on the standard form, but not on the Sunpath form, there is a place for the consignor to indicate whether the freight charges have been "prepaid" by the consignor or whether, instead, the carrier is required to "collect" the charges from the consignee on delivery. Neither designation appeared on the Sunpath forms that Schneider used. In addition, the standard form, but not the Sunpath form, includes a variety of provisions relevant to the amount of, and liability for, freight charges.

Until March 1993, St. Johnsbury regularly paid Schneider's invoices, and Schneider never requested payment from defendants. This was consistent with the agreements between defendants and St. Johnsbury, which made St. Johnsbury responsible for transporting the Sunpath shipments to defendants' respective distribution terminals. Beginning in late March 1993, however, St. Johnsbury began failing to pay Schneider's invoices. Schneider, nonetheless, continued making Sunpath deliveries until the middle of June 1993, without informing defendants of St. Johnsbury's failure to pay. Throughout this period, defendants continued to divide with St. Johnsbury the revenues they received from Sunpath deliveries.

On June 13, St. Johnsbury filed a petition for Chapter 11 bankruptcy. A week later, Schneider sent letters to each of the defendants demanding payment for dozens of Sunpath deliveries made by Schneider between March 21 and June 16. Schneider demanded a total of about $165,000 from all three defendants.

Local Rule 6.05(d).

---

**2.** This statement of fact is deemed to be undisputed because Schneider has not responded to it.

### III. Analysis

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

■ Schneider's claim that defendants are liable for its freight charges is based not on an express agreement to that effect, but on the common-law presumption that a consignee, the party entitled to delivery under a bill of lading, becomes liable for paying the carrier's freight charges upon delivery of the goods consigned.[3] *Louisville & Nashville R.R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 70, 44 S.Ct. 441, 443–44, 68 L.Ed. 900 (1924); *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink*, 250 U.S. 577, 582, 40 S.Ct. 27, 28, 63 L.Ed. 1151 (1919). The same liability is presumed to attach to the consignor, the party from whom the carrier receives the goods for delivery. *Southern Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 343, 102 S.Ct. 1815, 1820–21, 72 L.Ed.2d 114 (1982). But liability for paying freight charges is ultimately a matter of contract, so either presumption may be rebutted by evidence that the parties to the bill of lading had something else in mind. *Id.; Central Iron & Coal Co.*, 265 U.S. at 59, 67, 44 S.Ct. at 441, 442–43, 68 L.Ed. 900 (1924); *Consolidated Freightways Corp. v. Admiral Corp.*, 442 F.2d 56, 62 (7th Cir.1971).

Under the interline agreements between St. Johnsbury and defendants, St. Johnsbury was responsible for getting the Sunpath shipments to defendants' distribution terminals, and it was pursuant to this responsibility that St. Johnsbury agreed to pay Schneider for providing the service. As between St. Johnsbury and defendants, therefore, there can have been no intent or agreement on defendants' part to incur liability to Schneider.

Schneider contends, however, that since it was not party to the interline agreements, the agreements cannot have limited its common-law right to collect freight charges from defendants. In other cases, Schneider notes, the carrier's right against the consignee has been found to be limited only where the carrier itself expressed an intention to look elsewhere for the payment of freight charges. *See Consolidated Rail Corp. v. Briggs & Turivas, Inc.*, 678 F.Supp. 1298, 1300–01 (S.D.Ohio 1987); *Consolidated Freightways Corp.*, 442 F.2d at 59; *In re Roll Form Prods.*, 662 F.2d 150, 154 (2d Cir.1981). In the latter two cases, for example, the carrier was held to be "estopped" from demanding payment from the consignee where the carrier had allowed the bill of lading to indicate that freight charges had been "prepaid" by the consignor or shipper. No such marking appeared on the bill of lading at issue in *Consolidated Rail Corp.*, by contrast, and so the consignee there was held liable to the carrier, notwithstanding an agreement between the consignee and the consignor assigning liability for freight charges to the latter.

■ Thus, if Schneider's view of the law is correct, the question becomes whether anything in its use of Sunpath bills of lading evinced an understanding that Schneider would look exclusively to St. Johnsbury for payment. In this regard, it is useful to consider first what the Sunpath bills did not contain. In the usual case, when the carrier signs a bill of lading upon receiving goods for delivery, the bill serves both as a receipt and as a contract of carriage. *In the Matter of Bills of Lading*, 52 I.C.C. 671, 681 (1919). It

---

3. The parties' briefs and cases cited therein make occasional reference to 49 U.S.C. § 10744(a)(1), which provides that consignees who are "otherwise liable" for freight charges and who are acting as agents for the owners of the goods consigned may under certain circumstances limit their liability for such charges. The court's analysis will not consider this statute, however, for the parties have agreed that it does not affect resolution of Schneider's claim. (Mar. 8, 1994 Pl. Br. at 3; Mar. 25, 1994 Def. Br. at 4 n. 5.)

serves as receipt, because it describes the goods and lists their weight and quantity, as did the Sunpath bills. *Id. See also* 49 C.F.R. § 1051.1 (discussing the necessary contents of "the receipt or bill of lading" that motor carriers must issue upon receiving goods for interstate transportation). But as a contract, the usual bill contains other information as well; it

> names the contracting parties, specifies the rate or charge for transportation, and sets forth the agreement and stipulations with respect to the limitations of the carrier's common-law liability in the case of loss or injury to the goods and other obligations assumed by the parties or to matters agreed upon between them.

*Id.* On the Sunpath bills, no such provisions, save the names of the parties, are to be found. In this respect the Sunpath bills differ dramatically from the standard bill of lading used in the motor carrier industry, which sets forth the parties' respective obligations in two full pages of very small print. The omission of such terms from the Sunpath bills thus suggests that these bills were not intended to function as contracts of carriage, and that therefore they were not intended to convey liability for payment of freight charges.

This suggestion is confirmed by what the Sunpath bills do contain. Text in the bottom-left corner of each bill specifies that three of its four copies are to be given to Schneider's driver, and that one of these is to "return with invoice" to St. Johnsbury. The obvious implication is that freight charges were to be assessed not on the basis of the bill itself, but on the basis of an invoice sent separately from Schneider to St. Johnsbury, pursuant (necessarily) to a contract between the two. The Sunpath bills thus told defendants what they thought they already knew from the interline agreements: that payment of Schneider's freight charges was a matter of contract between Schneider and St. Johnsbury, and that it therefore did not concern them.

Essentially the same message was conveyed, though less directly, by the heading of the bills. The heading read not "Bill of Lading" but "Sunpath Bill of Lading," indicating that the document was intended to serve a purpose distinct from that of the standard bill of lading, and that the purpose it served conformed to operation of the Sunpath delivery system. As noted above, the Sunpath bills could not have conformed that system if they obligated defendants to pay Schneider's freight charges.

■ Finally, the way in which the Sunpath bills were used also indicates that they were not intended to have the effect of a traditional bill of lading. The usual practice is for the consignor or shipper, after receiving the bill from the carrier, to forward it, separately from the shipment, to the consignee named on the bill. *See* Todd, *Modern Bills of Lading* at 14, 19 (2d ed. 1990). This is because the bill, in addition to serving as a receipt and a contract of carriage, also establishes the consignee's right to possession of the goods; indeed this is the bill's most distinctive function. *Bills of Lading,* 52 I.C.C. at 681; *Modern Bills of Lading* at 3. To obtain the goods, the consignee must surrender or at least show the bill to the carrier.

The Sunpath bills, however, were not forwarded to defendants separately from the shipments. Rather, they were simply presented to defendants by Schneider's drivers when the drivers arrived at defendants' distribution terminals. The Sunpath bills thus cannot have served as "documents of title" establishing defendants' right to receive the shipments, and so lacked the most basic characteristic of a bill of lading. Defendants, moreover, because they did not receive the bills prior to arrival of Schneider's deliveries, were deprived of any meaningful opportunity to decide whether to reject them, as is the consignee's right when the bill fails to conform to the underlying contract of sale or shipment. *Modern Bills of Lading* at 75. Despite their label, therefore, the Sunpath bills of lading really were not used as bills of lading in the traditional sense, and so it is implausible to assert that they were intended to operate in the manner of a traditional bill of lading with respect to liability for payment of freight charges.

Thus, based on undisputed facts concerning the terms of the Sunpath system, and the contents and use of the Sunpath bills, the

court concludes as a matter of law that the bills expressed an intention on the part of Schneider and the other parties that Schneider would look exclusively to St. Johnsbury for payment of freight charges. The common-law presumption of consignee liability has therefore been rebutted, if indeed it ever arose.

**IT IS THEREFORE ORDERED** that Schneider's February 10, 1994 motion for summary judgment is DENIED.

**IT IS FURTHER ORDERED** that defendants' February 11, 1994 motion for summary judgment is GRANTED and this action DISMISSED.