**E.W. WYLIE CORPORATION, Plaintiff and Appellant,**

v.

**MENARD, INC., Defendant and Appellee.**

**Civ. No. 940078.**

Supreme Court of North Dakota.

Oct. 31, 1994.

Jon R. Brakke (argued), Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for plaintiff and appellant.

Michael F. Swensen (argued), Eau Claire, WI, for defendant and appellee.

MESCHKE, Justice.

E.W. Wylie Corporation (Wylie) appeals from a judgment denying it collection of unpaid freight charges from Menard, Inc. (Menard). Because contract law governs, we affirm.

Menard, located at Eau Claire, WI, is a retailer of building materials and home improvement products. Menard contracted with IKA Lumber Specialties Inc. (IKA) of Lackawanna, NY, for the purchase of lumber. The purchase orders dated January 11, 1993, called for delivery "F.O.B. Eau Claire" with "freight prepaid." The contract thus required IKA to pay the freight charges for transporting the shipments to Menard's Eau Claire facility. IKA then negotiated a contract with Wylie, an interstate motor carrier based in Fargo, to transport the lumber from Lackawanna to Eau Claire for $900 per load.

IKA told Wylie to bill IKA for the freight charges.

During February and March 1993, Wylie carried seven shipments of lumber from IKA in Lackawanna to Menard in Eau Claire. Upon delivery, each bill of lading was signed by a Menard employee. The bills of lading did not indicate the amount of the freight charges or who was liable for them.

Menard paid IKA for each lumber shipment after the shipment was received. These payments included compensation for the freight charges. After each delivery, Wylie billed IKA for the freight charges, but received no payments. In May 1993, IKA informed Wylie that it was ceasing operations immediately and that there were few assets available to pay its unsecured debts. Wylie then demanded payment of the freight charges from Menard, who refused to pay.

Wylie sued Menard for $6,300 in unpaid freight charges for the seven shipments of lumber between Lackawanna and Eau Claire. Following a trial without a jury, the court concluded, because no contract existed between Wylie and Menard, Menard was not liable to Wylie for IKA's unpaid freight bills.

In this appeal from that judgment, Wylie asserts that the trial court erred in refusing to hold Menard, as consignee, liable because, under both the common law and the Interstate Commerce Act, 49 U.S.C. §§ 10101 *et seq.*, consignors and consignees are jointly and severally liable to an interstate freight carrier for unpaid shipping charges, regardless of contract law. We reject Wylie's argument that contract law does not apply to this case.

I

The Interstate Commerce Act declares, "[e]xcept as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law." 49 U.S.C. § 10103. Wylie's claim that a consignor and consignee of shipped goods are always jointly and severally liable for a carrier's freight charges overstates the common law.

At one time, it was often said that a common law presumption existed that a consignee, the party entitled to delivery under a bill of lading, becomes liable for paying the carrier's freight charges upon delivery of the goods consigned. *See, e.g., Louisville & Nashville R.R. Co. v. Central Iron & Coal Co.,* 265 U.S. 59, 70, 44 S.Ct. 441, 443–444, 68 L.Ed. 900 (1924); *New York Cent. & H.R.R. Co. v. York & Whitney Co.,* 256 U.S. 406, 408, 41 S.Ct. 509, 510, 65 L.Ed. 1016 (1921); *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink,* 250 U.S. 577, 582, 40 S.Ct. 27, 28, 63 L.Ed. 1151 (1919). However, as *Central Iron* explained, 265 U.S. at 67, 44 S.Ct. at 443, primary liability was presumed to attach to the consignor, the party from whom the carrier receives the goods for delivery.

The cases relied on by Wylie to support its argument stem from these three early Supreme Court cases, *Fink, York & Whitney,* and *Central Iron.* But the Supreme Court's statements of the general common law rule in those cases must be considered in context. In *Fink,* the carrier undercharged the consignee at the time of delivery of a shipment of goods and later sued him for the unpaid balance of the lawful tariff rate. Although the consignor and consignee had apparently not agreed on who should pay the freight charges, the consignee paid the incorrect freight bill when presented to him. The Court held that the consignee was liable for the full sum fixed by the filed tariff, even though the carrier mistakenly charged the consignee a lower, illegal rate, and that the consignee could not invoke estoppel principles to defeat collection of the legal rate because to do so would thwart the major purpose of the Interstate Commerce Act— the prevention of unjust rate discrimination. Likewise, in *York & Whitney,* the consignee, who had accepted delivery and paid the carrier less than required under the carrier's filed tariff, was found liable for the undercharge. Relying on *Fink,* the Court rejected the consignee's argument that it could "escape the liability imposed by law through any contract with the carrier." *York & Whitney,* 256 U.S. at 408, 41 S.Ct. at 510. Rather, the Court said, "[t]he transaction between the parties amounted to an assumption by the consignee

to pay the only lawful rate it had the right to pay or the carrier the right to charge." *Id.*

■ *Fink* and *York & Whitney* better illustrate the "filed rate doctrine" than any common law rule. Simply put, the filed rate doctrine, deeply lodged in the complex history and turgid language of the Interstate Commerce Act, dictates that the rate a common carrier duly files with the Interstate Commerce Commission (ICC) is the only lawful rate it can charge for its services, and that deviation from the filed rate is not permitted under any pretext. *See Security Services, Inc. v. K Mart Corp.,* —— U.S. ——, ——, 114 S.Ct. 1702, 1706, 128 L.Ed.2d 433 (1994); *Maislin Industries, U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 126–28, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990); *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); 49 U.S.C. §§ 10761(a) (carrier "may not charge or receive a different compensation for that transportation or service than the rates specified in the tariff. . . .") and 10762(a)(1) (carrier must publish its rates in tariffs filed with ICC). Under the doctrine, agreements to charge a rate different than the filed tariff are disregarded, *Reiter v. Cooper,* —— U.S. ——, ——, 113 S.Ct. 1213, 1219, 122 L.Ed.2d 604 (1993), and "a carrier has not only the right but also the duty to recover its proper charges for services performed." *Southern Pac. Transp. Co. v. Commercial Metals Co.,* 456 U.S. 336, 343, 102 S.Ct. 1815, 1821, 72 L.Ed.2d 114 (1982). *Fink* and *York & Whitney* do not hold that the common law presumptions, as distinguished from the statutory filed rate doctrine, cannot be altered by contract.

■ This distinction is emphasized in *Central Iron,* where the Court examined contractual terms in the bills of lading to determine whether the consignor was liable for the uncollected balance of the legally required tariff. The bills of lading expressly placed primary responsibility for payment of freight charges on the consignee. The Court explained that, although a consignor ordinarily had the primary obligation to pay freight charges if the tariff did not say when or by whom the payment should be made, "[a]s to

these matters carrier and shipper were left free to contract, subject to the rule which prohibits discrimination." *Central Iron,* 265 U.S. at 66, 44 S.Ct. at 442 (footnote omitted). The Court pointed out that several earlier state and federal cases had "erroneously assumed that the mere fact of delivery of goods for shipment imports, under the Interstate Commerce Act, as matter of law, an absolute promise to pay the freight charges, and/or that an agreement to the contrary is void." *Central Iron,* 265 U.S. at 69 n. 7, 44 S.Ct. at 443 n. 7. *Central Iron* clarifies that contract law ordinarily determines who is liable for payment of freight charges under the common law.

■ We agree with those courts that have concluded that, because liability for payment of freight charges is largely a matter of contract, any common law presumption about responsibility for freight costs may be rebutted by evidence that the parties intended something else. *See In re Roll Form Products, Inc.,* 662 F.2d 150, 154 (2d Cir.1981); *Consolidated Freightways Corp. of Del. v. Admiral Corp.,* 442 F.2d 56, 61–62 (7th Cir. 1971); *New York Cent. R. Co. v. Trans–American Petroleum Corp.,* 108 F.2d 994, 997 (7th Cir.1939); *Schneider Nat. Carriers v. Rudolph Exp. Co.,* 855 F.Supp. 270, 273 (E.D.Wis.1994); *In re Chateaugay Corp.,* 78 B.R. 713, 722–723 (Bkrtcy.S.D.N.Y.1987); *In re Penn–Dixie Steel Corp.,* 6 B.R. 817, 820 (Bkrtcy.S.D.N.Y.1980), *aff'd,* 10 B.R. 878 (S.D.N.Y.1981); *Consolidated Freightways v. Peacock Eng.,* 256 Ill.App.3d 68, 194 Ill.Dec. 803, 807, 628 N.E.2d 300, 304 (1993); *Consol. Rail v. Hallamore Motor Transp.,* 394 Mass. 56, 473 N.E.2d 1137, 1138, *cert. denied,* 474 U.S. 918, 106 S.Ct. 246, 88 L.Ed.2d 254 (1985). *See also* 13 Am.Jur.2d *Carriers* § 473 (1964). Of "somewhat questionable lineage," *C.F. Arrowhead Services, Inc. v. AMCEC Corp.,* 614 F.Supp. 1384, 1388 (N.D.Ill.1985), the common law presumption advanced by Wylie has no application where there is an express contract.

## II

Wylie argues that an independent basis for Menard's liability is given in 49 U.S.C. § 10744 (part):

*Liability for payment of rates*

(a)(1) Liability for payment of rates for transportation for a shipment of property by a shipper or consignor to a consignee other than the shipper or consignor, is determined under this subsection when the transportation is provided by a rail, motor, or water common carrier under this subtitle. When the shipper or consignor instructs the carrier transporting the property to deliver it to a consignee that is an agent only, not having beneficial title to the property, the consignee is liable for rates billed at the time of delivery for which the consignee is otherwise liable, but not for additional rates that may be found to be due after delivery if the consignee gives written notice to the delivering carrier before delivery of the property—

(A) of the agency and absence of beneficial title; and

(B) of the name and address of the beneficial owner of the property if it is reconsigned or diverted to a place other than the place specified in the original bill of lading.

(2) When the consignee is liable only for rates billed at the time of delivery under paragraph (1) of this subsection, the shipper or consignor, or, if the property is reconsigned or diverted, the beneficial owner, is liable for those additional rates regardless of the bill of the lading or contract under which the property was transported. The beneficial owner is liable for all rates when the property is reconsigned or diverted by an agent but is refused or abandoned at its ultimate destination if the agent gave the carrier in the reconsignment or diversion order a notice of agency and the name and address of the beneficial owner. A consignee giving the carrier, and a reconsignor or diverter giving a rail carrier, erroneous information about the identity of the beneficial owner of the property is liable for the additional rates.

Judicial interpretations of § 10744 and its antecedents have not been uniform.

Some courts have strictly construed § 10744 and its antecedents, as well as other related parts of the Interstate Commerce

Act, as essentially imposing joint and several liability upon a consignor and consignee for payment of a common carrier's freight charges. *Southern Pacific Company v. Miller Abattoir Company,* 454 F.2d 357, 359–360 (3d Cir.1972); *Consolidated Rail Corp. v. Briggs & Turivas, Inc.,* 678 F.Supp. 1298, 1300–1301 (S.D. Ohio 1987); *Inman Freight Systems, Inc. v. Olin Corp.,* 614 F.Supp. 1355, 1359 (E.D.Mo.1985); *Hilt Truck Lines, Inc. v. House of Wines, Inc.,* 207 Neb. 568, 299 N.W.2d 767, 770 (1980). Believing that, "[s]ince the adoption of the Interstate Commerce Act on February 4, 1887, it was considered a matter of public policy that the Interstate Commerce Act demanded that the carrier receive full payment in every case," the Nebraska Supreme Court expressed this view in *Hilt Truck Lines,* 299 N.W.2d at 770 (citations omitted):

> A carrier has under the law two sources from which to seek payment of shipping charges. The first source is the consignor, the one who shipped the goods and who is generally primarily liable, and the second is the one who received the goods, called the consignee. They both, as a matter of law, are liable for the shipping charges....

Another line of cases has refused to accept the interpretation that the Interstate Commerce Act guarantees payment to a carrier under all circumstances. These courts conclude that the policy underlying § 10744, and the Interstate Commerce Act in general, is simply to prevent unjust rate discrimination against shippers. These cases have fashioned a limited exception to the consignee's liability through estoppel, and thus hold that, when a carrier falsely represents to a consignee upon delivery that the freight charge has been prepaid by the consignor, and when the consignee, in reliance on this representation, pays the consignor for the freight charge, the carrier is estopped from later collecting the unpaid freight charge from the consignee. *Southern Pacific Transportation Co. v. Campbell Soup Co.,* 455 F.2d 1219, 1221–1222 (8th Cir.1972); *Consolidated Freightways Corp. of Del. v. Admiral Corp.,* 442 F.2d 56, 61–63 (7th Cir.1971); *Arrowhead Services,* 614 F.Supp. at 1388; *Missouri Pacific Railroad Co. v. National Mill-*

*ing Co.,* 276 F.Supp. 367, 372 (D.N.J.1967), *aff'd,* 409 F.2d 882 (3d Cir.1969); *Atchison, Topeka et al. v. Texas Intern.,* 811 S.W.2d 685, 687 (Tex.Ct.App.1991); *Tom Hicks Trans Co. v. Ford, Bacon & Davis Texas Inc.,* 482 S.W.2d 364, 366–369 (Tex.Ct.Civ. App.1972). *Cf. Checker Van Lines v. Siltek Intern., Ltd.,* 169 N.J.Super. 102, 404 A.2d 333, 335–336 (1979) (recognizing availability of estoppel defense even when consignee has not paid freight charge to consignor). According to the Seventh Circuit Court of Appeals in *Admiral Corp.,* 442 F.2d at 62 (citation omitted), these "double-payment" cases do not violate the statutory proscription against discriminatory treatment of shippers, because

> Section 223 (the predecessor statute to § 10744) was not intended to fasten a rigid liability upon a consignee. Congress left the initial determination of a party's liability for freight charges to express contractual agreement or implication of law.... So long as payment of the full tariff charges may be demanded from some party, the anti-discrimination policy of the Section is satisfied. Congress did not undertake to settle all issues of collection with the enactment of Section 223. Nor did Congress intend to fashion a sword to insure collection in every instance and a shield to insulate the carrier from the legal consequences of otherwise negligent or inequitable conduct.

Yet another line of cases has gone further than the double-payment cases and simply held that a consignor and common carrier may agree that the consignor will be exclusively liable for the payment of freight charges, thus relieving the consignee of any liability. *In re Roll Form Products, Inc.,* 662 F.2d 150, 153–155 (2d Cir.1981); *In re Chateaugay Corp.,* 78 B.R. 713, 719–721 (Bkrtcy. S.D.N.Y.1987); *In re Penn–Dixie Steel Corp.,* 6 B.R. 817, 820–822 (Bkrtcy.S.D.N.Y. 1980), *aff'd,* 10 B.R. 878 (S.D.N.Y.1981). According to these decisions, such a contract does not violate the purpose of the Interstate Commerce Act to eliminate all forms of rate discrimination on interstate shipments.

■ Under the circumstances of this case, we need not decide which line of authority is the most persuasive nor which we should follow. By its own terms, 49 U.S.C. § 10744 imposes liability only "when the transportation is provided by a rail, motor, or water *common* carrier under this subtitle." (Emphasis added). *See Fikse & Co. v. United States,* 23 Cl.Ct. 200, 203–204 (1991). Since this was not common carriage, we conclude that § 10744 has no bearing on this case.

### III

The two principal forms of transportation in the interstate trucking industry are motor common carriage and motor contract carriage. *See Global Van Lines, Inc. v. I.C.C.,* 804 F.2d 1293, 1295 (D.C.Cir.1986). Contract carriage and common carriage were separately identified in the Motor Carrier Act of 1935, Pub.L. No. 74–255, 49 Stat. 543, that began federal regulation of the trucking industry. The Motor Carrier Act was "designed ... in large part, to prevent depression-squeezed contract carriers from encroaching on the domain of common carriers." *Central & Southern Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 309 (D.C.Cir.), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985) (footnote omitted). The Act "defined a contract carrier simply in terms of one engaged in transportation for compensation under special and individual agreements with customers. A common carrier, in contrast, was one undertaking transportation over regular or irregular routes for compensation for any member of the general public desiring it." *Global Van Lines,* 804 F.2d at 1295 (footnotes omitted). The Act generally barred "dual operations," preventing a carrier from engaging in both common and contract carriage. *Central & Southern.* As *Central & Southern* explained, 757 F.2d at 309–310, the Motor Carrier Act required a contract carrier to file a schedule setting out minimum rates that it could not charge below, but the Act also authorized the ICC to exempt contract carriers from the tariff-filing requirements.

After the Supreme Court expansively interpreted the definition of motor contract carrier in *United States v. Contract Steel Carriers, Inc.,* 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482 (1956), Congress sharpened the distinction between common and contract carriage in 1957 "to provide greater protection for the interests of common carriers." *Regular Common Carrier Conf. v. United States,* 803 F.2d 1186, 1189 (D.C.Cir.1986). That opinion, *id.* at 1188–1189 (footnote omitted), explains: "The 1957 amendments [Pub.L. No. 85–163, § 1, 71 Stat. 411, 411 (1957) ] required a contract carrier to enter into 'continuing contracts with one person or a limited number of persons' and to meet either the dedication of equipment or the distinct needs test."

■ That definition of contract carriage remained virtually unchanged until passage of the Motor Carrier Act of 1980, Pub.L. 96–296, 94 Stat. 793, that "substantially deregulated the motor carrier industry in many ways in an effort to 'promote competitive and efficient transportation services.' Pub.L. 96–296, § 4." *Maislin Industries,* 497 U.S. at 132–33, 110 S.Ct. at 2769. *See also* 49 U.S.C. § 10101(a)(2). As explained in *Central & Southern,* 757 F.2d at 311–312 (footnotes omitted):

> Specifically, the 1980 Act made contract carriage more attractive to motor carriers by (1) removing the prohibition against dual operations (thereby allowing the same carrier to operate as both a contract and a common carrier), (2) removing the limit on the number of shippers a contract carrier could serve, (3) removing restrictions on the nature of shippers, commodities shipped, and permissible geographic scope of contract carrier permits, (4) allowing contract carriers to serve freight forwarders, and (5) allowing contract carriers to utilize trailer-on-flatcar service. Many of these provisions ratified prior decisions of the Commission.

Since the 1980 Act, a motor carrier has been able to act either as a "motor common carrier," defined in 49 U.S.C. § 10102(14) as "a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both," or as a "motor contract carrier," defined in 49 U.S.C. § 10102(15)(B) as "a person providing motor vehicle trans-

portation of property for compensation under continuing agreements with one or more persons—(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or (ii) designed to meet the distinct needs of each such person." While motor common carriers continue to be bound by the filed rate doctrine, "the heart of motor carrier regulation," *In re J.H. Ware Trucking, Inc.,* 159 B.R. 527, 529 (Bkrtcy. E.D.Mo.1993), the distinction between the two forms of motor freight became especially relevant in 1983 when the "ICC, through exercise of its statutory authority ... exempted motor contract carriers from the requirements of the filed rate doctrine." *Atlantis Exp. v. Standard Transp. Services,* 955 F.2d 529, 533 (8th Cir.1992) (footnote omitted). *See* 49 U.S.C. §§ 10761(b) and 10762(f); *Exemption of Motor Contract Carriers from Tariff Filing Requirements,* 133 M.C.C. 150 (1983), *aff'd sub nom. Central & Southern Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301 (D.C.Cir.), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Because the Supreme Court has continued to strictly adhere to the filed rate doctrine, *see Maislin Industries,* the exemption from it for contract carriers has made contract carriage a defense to recovery on a common carrier undercharge claim. *See Thrasher Trucking Co. v. Empire Tubulars, Inc.,* 983 F.2d 46, 47 (5th Cir. 1993); *Covey v. ConAgra, Inc.,* 788 F.Supp. 1160, 1161 (D.Colo.1992); *J.H. Ware Trucking,* 159 B.R. at 529. The exemption of motor contract carriers from the requirements of the filed rate doctrine was a significant deregulation development.

In effect, the 1983 deregulation has decreased the importance of rate discrimination, and has encouraged rate competition through contract carriage. Even more deregulation ensued.

The ICC had defined "continuing agreements" for contract carrier status in 49 C.F.R. § 1053.1:

> No contract carrier by motor vehicle, as defined in 49 U.S.C. 10102(15) shall transport property for hire in interstate or foreign commerce except under special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments, and copies of which contracts or agreements shall be preserved by the carriers parties thereto so long as such contracts or agreements are in force and for at least one year thereafter.

However, effective June 20, 1992, the ICC repealed regulation 1053.1, thus eliminating the requirement that contracts be in writing and the other technicalities to be met for contract carriage. *See* ICC Ex Parte No. MC–198, *Contracts for Transportation of Property,* 8 I.C.C.2d 520 (1992), *appeal dismissed sub nom. Central States Motor Freight Bureau, Inc. v. United States,* No. 92–1258, 1993 WL 558020 (D.C.Cir. Dec. 28, 1993) (order)). Viewing these technicalities as "unnecessary regulatory obstacles to the development of optimal business communications and transactions between contract carriers and their customers," the ICC opted for a totality-of-the-circumstances test to determine whether the statutory requirements of 49 U.S.C. § 10102(15)(B) for contract carriage have been met and suggested a review of

> the circumstances surrounding the particular transportation service to determine whether the shipment or shipments at issue moved under a continuing agreement, and whether the transportation involved the use of dedicated equipment or a service tailored to meet the distinct needs of the shipper. But it is the totality of the circumstances surrounding any particular movement, not the presence or absence of a written contract, that determines whether the transportation is contract carriage.

*Contracts for Transportation of Property,* 8 I.C.C.2d at 529. This additional deregulation development affects this case.

The elimination of the technical requirements of 49 C.F.R. § 1053.1 was relatively short-lived, however. Effective December 3, 1993, the regulatory requirements were reinstated and codified by the Negotiated Rates

Act of 1993, Pub.L. No. 103–180, § 6(a), 107 Stat. 2044, 2050 (currently codified at 49 U.S.C. § 10702(c)). The Negotiated Rates Act of 1993 "significantly changed the law by promulgating retroactive standards to determine whether a motor carrier or its representative is entitled to undercharge claims." *Matter of Best Refrigerated Exp., Inc.*, 168 B.R. 978, 980 (Bkrtcy.D.Neb.1994). Still, 49 U.S.C. § 10702(c)(1) clarifies that the statutorily-revived, written contract requirements apply only to contracts entered into 90 days after the date of enactment. For that reason, we conclude that the regulations reinstated by the Negotiated Rates Act of 1993 do not affect this case.

■ Because the shipping contract between IKA and Wylie was entered into, and the shipments were made, during early 1993, the deregulated environment between June 20, 1992 and December 3, 1993, controls this case. We must therefore apply the totality-of-the-circumstances test, rather than any reinstated regulatory requirements, to determine whether Wylie acted as a motor contract carrier in its relationship with IKA. *See F.P. Corp. v. Golden West Foods, Inc.*, 807 F.Supp. 1228, 1230 (W.D.Va.1992); *Covey v. ConAgra, Inc.*, 788 F.Supp. 1160, 1162 n. 1 (D.Colo.1992). That analysis is next.

### IV

Contract carriage is transportation provided under a continuing agreement by either assigning motor vehicles for the exclusive use of a shipper or by providing services designed to meet that shipper's distinct needs. 49 U.S.C. § 10102(15)(B). "Distinct needs," as interpreted by the courts, is " 'a need for a different or a more select or a more specialized service than common carriage provides.' " *Transrisk Corp. v. Matsushita Elec. Corp.*, 15 F.3d 313, 316 (4th Cir.1994), quoting *Global Van Lines*, 804 F.2d at 1301. *See also Interstate Commerce Commission v. J–T Transport Company*, 368 U.S. 81, 91, 82 S.Ct. 204, 210, 7 L.Ed.2d 147 (1961). *Dan Barclay, Inc. v. Stewart & Stevenson Services*, 761 F.Supp. 194, 200 (D.Mass.1991), quoting *Dixie Midwest Express, Inc., Extension—General Commodities*, 132 M.C.C. 794, 813 (1982), said: "Services are considered 'more specialized' to the extent that they '[differ] in quality, in priority, in control by the shipper, or in some other significant respect, from the service a common carrier holds out to the public at large.' "

In this case, Wylie apparently has authority to operate as both a common carrier and a contract carrier. Wylie's director of finance testified that its filed tariff rate was approximately nine cents per mile more expensive than its negotiated contract rate with IKA, a contract rate that did "not have to be published with the ICC." Wylie sent a written "standard contract" signed by Wylie representatives to IKA covering the shipments, but IKA did not return it and Wylie had no record of it. The trial court found that Wylie and IKA had entered into an agreement to transport the lumber to Menard at a rate of $900 per load. According to Wylie's director of finance, part of the terms of the agreement was that IKA would pay the freight charges within 30 days of shipment. Wylie hauled seven loads of lumber on its trucks for IKA to Menard during a two-month period under this agreement.

■ Under the relaxed regulatory standards of the ICC at the time, and given Wylie's concession that its charges were based on a negotiated rate, not a filed rate, we conclude in this case that the relationship between Wylie and IKA was contract carriage. The evidence reflects "that equipment was dedicated and that distinct needs were being met on a committed basis over a continuing period. And that is enough." *Brizendine v. Reliable Corp.*, 152 B.R. 224, 226 (Bkrtcy.N.D.Ill.1993). *See also In re United Shipping Co.*, 134 B.R. 359, 366 (Bkrtcy. D.Minn.1991). Those factors are enough here, too, to evidence contract carriage.

■ Because Wylie operated as a motor contract carrier rather than a motor common carrier during its relationship with IKA, *see Fikse*, 23 Cl.Ct. at 203–204, we conclude that Wylie's reliance on 49 U.S.C. § 10744 as imposing liability on Menard is misplaced. The filed rate doctrine has no application to this case.

## V

We also conclude that the common law presumption of secondary liability of a consignee, who accepts delivery, for unpaid freight charges has been rebutted in this case. Three cases are particularly helpful in resolving this question.

In *Schneider Nat'l Carriers*, 855 F.Supp. at 270, a carrier sued consignees for freight charges arising out of deliveries the ·carrier had made to them. The carrier and consignor established rates for transportation that were filed with the ICC, and it was orally agreed that the carrier would bill the consignor by the tariff after the shipments were delivered to the consignees' terminals. The consignees were not party to the carrier's agreement with the consignor, and the carrier was not party to the agreement between the consignor and consignees that made the consignor responsible for delivering the shipments to the consignees. Upon delivery, the carrier's driver would present the bill of lading to a representative of the consignee, who would inspect the shipment, indicate whether the shipment was intact, and sign the document for the consignee. Unlike the industry's standard bill of lading form, these bills did not state whether freight charges had been prepaid by the consignor or whether the carrier was required to collect the charges from the consignee on delivery. Until March 1993, the consignor regularly paid the carrier's invoices, and the carrier never requested payment from the consignees. But· the consignor did not pay the freight charges from March through June in 1993, when the consignor filed for bankruptcy. The carrier then sought to collect unpaid freight charges from the consignees based on the common law presumption that a consignee becomes liable for the carrier's freight charges upon delivery and acceptance of the shipment.

The court, holding that the common law presumption can be altered by contract, first determined that the agreement between the consignor and consignee, making the consignor responsible for the freight charges, did not constitute an "agreement on [the consignees'] part to incur liability to [the carrier]." *Id.* at 273. In response to the carrier's argument that the agreement between the consignor and consignees could not limit its common law rights because it was not a party to the agreement, the court said that the omission of liability terms from the bills of lading "suggest[ed] that these bills were not intended to function as contracts of carriage, and that therefore they were not intended to convey liability for payment of freight charges." *Id.* at 274. Instead, the court said, the bills simply "told [the consignees] what they thought they already knew . . .: that payment of [the carrier's] freight charges was a matter of contract between [the carrier] and [the consignor], and that it therefore did not concern them." *Id.* The court, *id.* at 275, concluded

> as a matter of law that the bills expressed an intention on the part of [the carrier] and the other parties that [the carrier] would look exclusively to [the consignor] for payment of freight charges. The common-law presumption of consignee liability has therefore been rebutted, if indeed it ever arose.

In *Chateaugay Corp.*, 78 B.R. at 713, a common carrier sought to collect unpaid freight charges from a bankruptcy debtor's consignees. The debtor applied to the bankruptcy court for an order restraining the carrier from continuing its actions against the consignees. The debtor, as consignor, billed its consignee customers a net amount for delivered materials inclusive of freight. The consignor had been paying the freight charges to the carrier until the bankruptcy. The bills of lading were marked "prepaid" and were signed by the carrier's agents. The court determined that, although a carrier has an independent common law right to collect freight charges from a consignee, nothing precludes the parties from contractually altering that liability. Recognizing that a notation of "prepaid" on a bill of lading is but one factor to consider in determining whether the parties had agreed that the consignor would be exclusively liable for shipping charges, the court listed several other relevant factors, including whether: (1) the carrier historically looked· solely to the consignor for payment; (2) this was the understanding of the parties as evidenced by their

business relationship; (3) the consignor alone contracted with the carrier for shipping services; and (4) direct billing was effected from carrier to consignor, and that direct billing took place after delivery. *Id.* at 723–724. Finding these factors present, the court concluded, *id.* at 725, that the consignor and carrier had entered into an enforceable agreement rendering the consignor exclusively liable to the carrier for all freight charges.

In *Fikse & Co. v. United States*, 23 Cl.Ct. 200 (1991), the consignor agreed with the consignee to manufacture and deliver boxes to the consignee. The consignee was to pay the consignor for the costs of shipping the boxes. The consignor then contracted with a private motor contract carrier to ship the boxes to the consignee, with the carrier to be paid by the consignor. The consignee was not a party to the carriage agreement. Upon delivery of the shipments, the carrier presented a bill of lading or memorandum to the consignee's employee, who signed for receipt of the goods. When the consignor filed for bankruptcy, the consignee had paid the consignor for all but one of the shipments, but the consignor had not paid the carrier for the last nine shipments. The carrier sued the consignee, claiming that it was liable for the unpaid shipping charges because the consignee, as the named consignee on the bills of lading, accepted the freight delivered by the carrier.

The court rejected the carrier's argument that the consignee's acceptance of the bill of lading created an implied-in-fact contract between the carrier and consignee. Apparently, the bills of lading contained only rate and payment terms and were not marked "prepaid." Noting that the bill of lading has traditionally been viewed as a transportation contract between the carrier and the shipper-consignor, and not with the consignee, the court said "[t]he fact that the consignee must take notice of rate and payment terms for the delivery does not mean that a contractual obligation springs up in the consignee to pay shipping charges in the absence of an agreement by it to do so." *Id.* at 203. The court also rejected the argument that the consignee could not extricate itself from the common

law consignee liability rule because the bills of lading were not marked "prepaid." After reviewing the case law, the court concluded that "liability allocation presumptions are unnecessary in the face of other provisions for payment. In the present case there was another provision for payment of shipping charges, the contract between [the consignor] and [the carrier]." *Id.* The court granted the consignee's motion for summary judgment, ruling that "no implication of an agreement to pay could arise by acceptance in view of the express provisions obligating [the consignor] to pay shipping charges." *Id.*

Although the consignee-defendant in *Fikse* was the United States, which "enjoys a unique status as the sovereign," *id.* at 202, the court's analysis conforms with the analyses of the courts in *Schneider Nat'l Carriers* and *Chateaugay Corp.* Given Wylie's status as a contract carrier in its business relationship with IKA, and the ICC's relaxation of its regulation of contract carriage during this period of time, we believe that the *Schneider Nat'l Carriers, Chateaugay Corp.*, and *Fikse* precedents approving contractual allocation of liability for freight charges frame the proper analysis for this case.

Here, the trial court found that Menard's contract with IKA required IKA to pay Wylie's freight charges at its agreed rate of $900 per load. The trial court further found that Menard did not contract to pay Wylie for its services in transporting the lumber, and that Menard's payments to IKA included "imputed freight charges." Under NDRCivP 52(a), these findings are clearly correct.

We believe the circumstances of this case evidence an arrangement establishing IKA's exclusive liability for freight charges. Although Wylie was not a party to Menard's agreement with IKA, IKA directed Wylie to bill it for transportation costs in a manner that conformed to the agreement between IKA and Menard. During their entire business relationship, Wylie looked solely to IKA for payment and billed it for freight charges after each delivery. *See Chateaugay Corp.*, 78 B.R. at 723–724. Even though freight charges were more than 30 days past due on several of the shipments, Wylie did not con-

tact Menard in regard to payment until IKA informed Wylie that it was unable to make any payments. The bills of lading were silent as to the liability for and the amount of freight charges, and they thus confirmed Menard's understanding that payment of freight charges was not a matter for its concern, but was a matter of contract between IKA and Wylie. *See Schneider Nat'l Carriers,* 855 F.Supp. at 274. These facts do not support an implied agreement that Menard would be liable to Wylie for the freight charges. *See Fikse,* 23 Cl.Ct. at 204. Rather, we conclude that any common law presumption is satisfactorily rebutted because the circumstances evidence an intention on the part of Wylie and the other parties to the arrangement that Wylie would look exclusively to IKA for payment of the freight charges.

Accordingly, we affirm the judgment denying Wylie's complaint.

VANDE WALLE, C.J., and NEUMANN and SANDSTROM, JJ., and ALLAN L. SCHMALENBERGER, District Judge, concur.

ALLAN L. SCHMALENBERGER, District Judge, sitting in place of LEVINE, J., disqualified.