## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20725

United States Court of Appeals
Fifth Circuit

**FILED**
January 3, 2020

Lyle W. Cayce
Clerk

UNIVERSAL TRUCKLOAD, INCORPORATED,

Plaintiff - Appellant

v.

DALTON LOGISTICS, INCORPORATED; HESS CORPORATION;
HELMERICH & PAYNE INTERNATIONAL DRILLING COMPANY,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, STEWART, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Universal Truckload appeals an adverse judgment following a jury trial. Because Universal Truckload fails to demonstrate reversible error, we AFFIRM.

I.

Appellee Dalton Logistics is a shipping broker. Dalton spearheads its clients' large-scale shipments of heavy-duty freight such as oil-field equipment and rigs. Two of Dalton's former clients—Helmerich & Payne International Drilling Co. and Hess Corporation—are co-appellees in this appeal. H&P and Hess hired Dalton to coordinate the transportation of disassembled oil rigs. Dalton outsourced the trucking to appellant Universal Truckload. Dalton owed Universal Truckload $1.9 million for the trucking services it provided. Dalton

No. 17-20725

never paid Universal Truckload for its services and Universal Truckload sued Dalton, H&P, and Hess.

On the surface, this case seems simple: Party A provided shipping services to Party B, and Party B never paid. But many of the key issues in this case turn on another part of the story. In response to Universal Truckload's lawsuit, Dalton counterclaimed, alleging that Universal Truckload had promised to purchase Dalton but never fully finalized the deal, instead stringing Dalton along for over a year. Dalton says that it entered into the shipping contracts with H&P and Hess entirely at Universal Truckload's direction and that Universal Truckload had even told Dalton *not* to pay the debt owed to Universal Truckload on these projects. Dalton complains that it spent all of its cash—burning every last asset—at Universal Truckload's direction with constant assurances that the purchase would soon be finalized. Dalton's legal theory, successful at the district court, was promissory estoppel: Dalton spent millions in reliance on the ultimately broken promise that Universal would take over soon. The facts comprising Dalton's counterclaim are detailed below.

In March of 2013, Dalton lost a lucrative contract. Without that business, Dalton struggled financially. Dalton's executives had to decide whether they should restructure the entire company to stay afloat or take the profits and unwind the company completely. Dalton's executives settled on the latter. President Dick Meredith and Vice President of Operations Jack Robison planned to take their profits, close their operations in North Dakota, and return to Texas. As part of closing shop, Dalton contacted Universal Truckload, whom they regularly worked with, and told Universal Truckload to take its trucks out of North Dakota because Dalton would no longer be needing them. However, instead of taking the trucks back, Universal Truckload's president, Marc Limback, expressed interest in buying Dalton. Dalton was

2

open to the idea but told Universal Truckload that the deal would need to happen quickly because Dalton lacked the cash sufficient to last long on its own.

Dalton, who had "already shut [the] company down," "cranked it back up" at Universal Truckload's request. Universal Truckload sent Dalton an Indication of Interest Letter and then Don Cochran, president of Universal Truckload's parent company, and Limback came to North Dakota in April to see Dalton's operations in person. Dalton claims that since the initial conversation regarding purchasing Dalton, Limback and Cochran were in near-constant communication with Dalton about the purchase, routinely giving assurances that a deal would be finalized soon.

On May 31, 2013, Universal Truckload officers met with Dalton officers in Detroit, Michigan. Dalton alleges that at this meeting, it reminded Universal Truckload that time was of the essence considering Dalton's dwindling financial resources. Dalton alleges that Universal Truckload responded to this with an offer to buy Dalton for $25 million, but Universal Truckload claims that this agreement was never made.

Shortly after the May 31 meeting, Universal Truckload became embroiled in internal political upheaval. A new merger left the old officers—who had promised to purchase Dalton—at odds with the new officers—who allegedly did not want the deal. Dalton claims that it continued to remind Cochran that it was running low on cash and needed the deal done quickly and that Cochran continually reassured Dalton that the deal was almost finalized. These assurances that the deal would eventually work out allegedly continued for months, all while Dalton continued to deplete its resources to keep the company operational for Universal Truckload's promised buyout.

In August 2013, Dalton sent financial statements to Universal Truckload. Three weeks later, Universal Truckload sent Dalton an Asset

Purchase Agreement offering $10.3 million upfront with a potential two-year earn-out totaling $24.3 million.  Dick Meredith called Cochran to object to the new terms and Cochran agreed that this was not the deal Universal Truckload and Dalton had struck in May.  Cochran assured Dalton that he would be able to get the executives at Universal Truckload to agree to get something done.

In early 2014, Cochran allegedly urged Dalton to "[i]ncrease [its] revenue" by "getting outside help, other cranes, other trucks and so forth, to be able to . . . help us do more rigs."  Dalton did not have enough cash to pay Universal Truckload for trucks so Universal Truckload increased Dalton's credit limit and provided the trucks on credit.

Eventually, after eighteen months, Universal Truckload executives overruled Cochran, demanded Dalton repay the $1.9 million, and called Dalton's bond.  At this point, Dalton had no money to repay Universal Truckload as it had been paying to keep the company afloat for over eighteen months.  Dalton, which was valued at $5.7 million in April of 2013, now had no assets, and instead owed Universal Truckload $1.9 million.

Universal Truckload sued Dalton, H&P, and Hess to recover the unpaid bills. It brought the same claims against each defendant, alleging breach of contract, breach of quasi-contract, and breach of a sworn account.  It argued that all defendants were liable for Dalton's debt under theories of equitable subrogation, agency, and ratification.  Dalton counterclaimed alleging breach of contract and, in the alternative, promissory estoppel.

Hess moved for summary judgment on all of Universal Truckload's claims against it. The district court granted Hess's motion and determined that Universal Truckload's breach of contract claim failed as a matter of law because Universal Truckload failed to present any evidence that Hess consented to the terms of a shipping contract with Universal Truckload. Universal Truckload's other claims against Hess also failed as Universal

No. 17-20725

Truckload "failed to cite, nor [could the district court find], a single case holding that a shipper is liable to a carrier of freight without some sort of contract existing between the parties."

Universal Truckload's claims against H&P were partially dismissed at summary judgment. On H&P's motion, the district court dismissed Universal Truckload's claims alleging H&P was liable to Universal Truckload for the loads Universal Truckload subcontracted out.  The remaining claims— regarding the loads Universal Truckload moved itself—proceeded to trial. At the close of a week-long trial, the jury found that Universal Truckload had no contract with H&P, and therefore, Universal Truckload could not recover from H&P.

All of Universal Truckload's claims against Dalton, and Dalton's crossclaims against Universal Truckload, proceeded to a jury trial. The jury found that Dalton should recover under a promissory estoppel theory.  Dalton was awarded $5.7 million in reliance damages—the difference between the amount of cash it had on hand before Universal Truckload's promise and the "zero" balance in its bank account when Universal Truckload called its bond. The jury awarded Universal Truckload the $1.9 million in freight charges that Dalton owed.  The court, however, concluded that the $1.9 million was incurred in reliance on Universal Truckload's promises and therefore awarded Dalton a $1.9 million offset against Universal Truckload's breach of contract claim.

## II.

Universal Truckload raises four issues on appeal, asking this court to: (1) reverse the judgment for Dalton because there was not sufficient evidence to support Dalton's claim of promissory estoppel; (2) reverse the district court determination that the $1.9 million awarded to Universal Truckload for breach of contract be offset because it was entered solely in reliance on Universal Truckload's promise; (3) reverse the judgment in favor of H&P and award

No. 17-20725

Universal Truckload the freight charges for Universal Truckload's transportation of H&P's freight; and (4) reverse the grant of summary judgment in favor of Hess and award Universal Truckload the freight charges owed by Hess.[1]

### A.

The jury awarded $5.7 million to Dalton. After the jury verdict, Universal Truckload sought a JMOL reversing that award. The district court denied that motion and now Universal Truckload asks this court to reverse the district court's denial of the JMOL, in effect reversing the jury verdict. Universal Truckload advances three arguments for reversal. First, Universal Truckload asserts that it never promised to purchase Dalton. Second, even if it did promise to purchase Dalton, Universal Truckload claims Dalton's reliance on the promise was unreasonable. And third, even if Dalton had a viable promissory estoppel theory, Universal Truckload contends that there was insufficient evidence that Dalton spent $5.7 million in reliance on Universal Truckload's promise. Because there was sufficient evidence to conclude Universal Truckload made a promise, Dalton reasonably relied on the promise to its detriment, and that reliance caused Dalton $5.7 million in damages, we affirm the district court's denial of the JMOL and the jury verdict on Dalton's promissory estoppel claim.

The parties contest the standard of review applicable to the challenge of the denied JMOL. Universal Truckload argues that it preserved this issue in

---

[1] We have subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy is over $75,000 and the parties are diverse. Plaintiff-Appellant Universal Truckload is a Michigan corporation with its principal place of business in Michigan. Defendants-Appellees are all citizens of other states. Dalton is a Texas corporation with its principal place of business in Texas. Hess is a Delaware corporation with its principal place of business in New York. And H&P is a Delaware corporation with its principal place of business in Oklahoma.

the district court through its Rule 50(a) motion and renewed Rule 50(b) motion. It therefore asks this court to review its arguments *de novo*. *See Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008) (explaining that this court reviews "de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court" (quoting *Int'l Ins. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005)). However, in its Rule 50(a) motion, Universal Truckload did not challenge any promissory estoppel theories. Its Rule 50(a) motion pertained to: insufficient evidence of a valid contract, insufficient evidence of benefit-of-the-bargain damages, and insufficient evidence of reliance damages. After the verdict, in its Rule 50(b) motion, Universal Truckload raised arguments about promissory estoppel. But, we have explained that a "Rule 50(b) motion is technically only a renewal of the Rule 50(a) motion," and therefore, the movant "cannot assert a ground that was not included in the original motion." *In re Isbell Records, Inc.*, 774 F.3d 859, 867 (5th Cir. 2014) (alterations and internal quotation marks omitted) (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir. 1985)). Dalton correctly asserts that Universal Truckload's arguments that a promise was not made or reasonably relied upon, raised for the first time in the Rule 50(b) motion, are not preserved. We therefore review them for plain error. *See Seibert v. Jackson Cty.*, 851 F.3d 430, 435 (5th Cir. 2017).

Universal Truckload's argument that there was insufficient evidence to support the $5.7 million jury verdict was preserved in its Rule 50(a) motion and renewed in its Rule 50(b) motion. It is therefore reviewed *de novo. Streber v. Hunter*, 221 F.3d 701, 730 (5th Cir. 2000). However, the standard under which it is reviewed is itself deferential to the trial court, drawing "all reasonable inferences and resolv[ing] all credibility determinations in the light most favorable to the nonmoving party." *Foradori*, 523 F.3d at 485; *see also id.* (noting that "unless there is no legally sufficient evidentiary basis for a

reasonable jury to find as the jury did" this court must uphold the verdict (internal quotation marks and citation omitted)); *Seibert*, 851 F.3d at 434–35.

1.

Under the *Erie* doctrine, this court must apply substantive state law in diversity jurisdiction cases. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Here, the parties agree that Texas law applies. The elements of promissory estoppel in Texas are: "(1) a promise, (2) reliance thereon that was foreseeable to the promisor, and (3) substantial reliance by the promisee to his detriment." *J.D. Fields & Co. v. U.S. Steel Int'l*, 690 F. Supp. 2d 487, 503–04 (S.D. Tex. 2009); *see also MetroplexCore, L.L.C. v. Parsons Transportation, Inc.*, 743 F.3d 964, 977 (5th Cir. 2014). Universal Truckload's first argument goes directly to prong one: that there was no promise made.

Dalton argues that Universal Truckload promised to purchase Dalton on May 31, 2013. Universal Truckload argues the promise never happened, and that Dalton's own actions make that clear. At trial, Dalton's president admitted that for nearly two years after the alleged promise was made Universal Truckload never sent Dalton any paperwork formalizing the agreement and Dalton did not ask for any written agreement. And though Dalton says that an initial payment of $18 million was promised at the May meeting and due in August 2013, there is no evidence that Dalton ever complained about not receiving a past due payment. Universal Truckload asserts that Dalton's consistent failures to enforce or formalize the alleged promise prove that a promise was never made.

In contrast, Dalton points to Universal Truckload's post-promise conduct. The record on appeal shows that Universal Truckload's leadership had a "running dialog" about the takeover with Dalton leadership for over a year. Universal Truckload repeatedly asked Dalton to "hang in there," and assured Dalton that it would "get something done." Universal Truckload even

went so far as to "float[] alternative deal structures" and instruct "Dalton not to repay the $1.9 million of debt it had incurred at Universal Truckload's behest" and "[k]eep [those] dollars" because the parties would "finalize the dollars at closing." Dalton maintains that this post-promise conduct, coupled with the initial promise in the May 2013 meeting, was more than enough evidence for a jury to conclude that Universal Truckload had promised to purchase Dalton.

We considered similar facts in *MetroplexCore*. There, an engineering firm bid for a contract to build a passenger rail line in Houston. 743 F.3d at 968. The lead contractor repeatedly assured MetroplexCore, the plaintiff, that it would be included in the project if the defendant's bid got accepted. *Id.* at 970. The defendant regularly reassured MetroplexCore by saying "our commitment to you is still in play," "we are still committed to MetroplexCore being on the management team," and "we are going to live up to our commitment to you," among other reassurances. *Id.* at 970–71. When MetroplexCore was not included in the project, it sued the lead contractor for reliance damages based on its promise. *Id.* at 971. We held that these numerous, specific statements constituted actionable promises, and accordingly reversed the district court's grant of summary judgment for the defendant. *Id.* at 982.

The reassurances made here seem at least as strong as those made in *MetroplexCore*. The reassurances given were just as continuous, numerous, and specific. Despite Dalton's lack of action to formalize the promise, the jury was presented with sufficient evidence to find a promise occurred. The district court did not plainly err by denying the JMOL and upholding the jury's verdict.

2.

Universal Truckload's second argument, also reviewed for plain error, is that Dalton's reliance on the promise was not reasonable. In support,

Universal Truckload primarily relies on the "Indication of Interest" (IOI) it sent to Dalton. The IOI expressed Universal Truckload's interest in purchasing Dalton, but it stated that the agreement was "only an indication of interest and is not intended to be legally binding." The IOI explained that Universal Truckload would enter into a binding contract to purchase Dalton only after the fulfillment of certain conditions: the completion of due diligence, the lack of any materially adverse change in Dalton's business, and approval by Universal Truckload's board of directors. Because the conditions laid out in the IOI were never completed, Universal Truckload insists that Dalton's reliance on the alleged oral promise was unreasonable. We disagree.

Universal Truckload relies on the Supreme Court of Texas's decision in *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648 (Tex. 2018). In *JPMorgan*, the relying party had signed a binding letter of intent that contradicted the terms of the oral promise it allegedly relied on. *Id.* at 651. The Supreme Court of Texas held that reliance on the oral promise was unreasonable because it directly contradicted the written contract and the relying party was aware of other red flags that made reliance unreasonable. *Id.* at 660. Universal Truckload claims that *JPMorgan*'s holding should apply here: Dalton received the IOI and "should have viewed [a certain] series of events as a red flag warranting further investigation" in light of "the amount of money involved in the transaction" and the "ambiguous nature of [the defendant's] assurance." *Id.* at 655 (second alteration in original) (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 547 (5th Cir. 2003)).

However, this case differs from *JPMorgan* in at least three crucial ways. First, the letter of intent at issue in *JPMorgan* was a binding contract signed by both parties. The IOI that Universal Truckload sent Dalton is expressly nonbinding. Second, the letter of intent in *JPMorgan* included a clause disclaiming any oral agreements. *Id.* at 650–51. Universal Truckload's IOI

does not. And third, the letter of intent in *JPMorgan* directly contradicted the oral promise, and Universal Truckload's IOI does not. The Supreme Court of Texas explained in *JPMorgan*, "there is no direct contradiction if a reasonable person can read the writing and still plausibly claim to believe the [oral] representation." *Id.* at 659. The conditions laid out in the IOI explain what would need to happen if Universal Truckload was to enter a *contract* to purchase Dalton. But the jury did not find in favor of Dalton on a contract theory. Dalton succeeded on a *promissory estoppel* theory, which requires the absence of a contract. *See Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965) (explaining that promissory estoppel exists to furnish a remedy for "reasonable reliance upon an *otherwise unenforceable* promise" (emphasis added)). The IOI's discussion of contractual prerequisites does not directly contradict the oral promise that Universal Truckload would purchase Dalton.[2]

Universal Truckload was of course free to use the IOI as evidence that the oral promise was not reasonably relied upon. But the jury was also free to weigh all the evidence presented and conclude to the contrary. Between Universal Truckload's initial promise to acquire Dalton on May 31 and Limback's and Cochran's repeated promises over the ensuing months that they would "make it work," the jury was presented with sufficient evidence to conclude that despite the IOI, Dalton's reliance was reasonable. The district court did not plainly err by denying the JMOL and upholding the jury's finding.

---

[2] In a letter submitted to the court under Rule 28(j) of the Federal Rules of Appellate Procedure, Universal Truckload points this court to *Mercedes-Benz USA, LLC. v. Carduco, Inc.*, 583 S.W.3d 553 (Tex. 2019), a recent decision by the Supreme Court of Texas. Universal Truckload argues that "*Carduco* is relevant legally and factually to Universal [Truckload]'s position." In *Carduco,* the court determined that reliance was not reasonable when factual "red flags" would prompt a party to exercise diligence before relying on oral assurances. However, like *JPMorgan*, the facts of *Carduco* differ significantly from the facts before us in this case. The promisee in *Carduco* relied on a promise despite "the [Agreement] he signed expressly" providing that the promisor "was under no such obligation." *Id.* at 563.

No. 17-20725

3.

In its final argument challenging the district court's denial of its JMOL, Universal Truckload contends that the district court erred by not vacating the jury's $5.7 million judgment in Dalton's favor. Universal Truckload explains that even if this court concludes that a promise was made and reasonably relied upon, there is insufficient evidence to support the award of $5.7 million. We review the denial of the JMOL *de novo*, but "all reasonable inferences and . . . all credibility determinations [are viewed] in the light most favorable to the nonmoving party." *Foradori*, 523 F.3d at 485.

The disputed damage award hinges on the parties' differing conceptions of the dates Universal Truckload "broke" its promise. The parties agree that Dalton's reliance began on May 31, 2013, when the alleged promise was made. But because there can be no reasonable reliance after a clear repudiation of a contract, Universal Truckload asserts that any reasonable reliance ended on August 27, 2013, when it offered to purchase Dalton for a lower amount of money. *See Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 436 (5th Cir. 2001) (holding that there could be no reasonable reliance on a contract following its repudiation). Because Dalton was worth $5.7 million on May 31 and on August 27, Universal Truckload claims the evidence does not support any reliance damages.

However, Universal Truckload's argument suffers from two fatal flaws. First, it misunderstands the "promise" at issue, and therefore it miscalculates the relevant date range. Universal Truckload acts as if the promise from which Dalton's claim arises was a specific promise to purchase Dalton for $25 million. But Dalton's promissory estoppel claim rests on a much broader promise: Universal Truckload's promise to purchase Dalton *at all*. The reassurances that Dalton and Universal Truckload would strike a deal, and that eventually

Dalton would be purchased, continued long after Universal Truckload made a lower offer in August 2013.

Second, Universal Truckload misreads the case law. *Connor* holds that reliance *on a contract* is not reasonable after the other party unequivocally repudiates its obligations. 267 F.3d at 436. Here, there is no contract at issue, and therefore there is nothing Universal Truckload could have "unequivocally repudiated." *Connor* does not require reliance damages to stop in August 2013, because the promise at issue was not clearly broken until a much later date— when Universal Truckload expressly told Dalton it would not be purchasing the company *at all* and required Dalton to repay the $1.9 million.

Dalton presented sufficient evidence to support the jury's award of $5.7 million. At the time Dalton was preparing to shut its doors in May of 2013, the evidence indicates Dalton's valuation was $5.7 million. This is supported by "testimony from multiple witnesses—including Universal [Truckload] witnesses." And when it finally became clear that Universal Truckload had no intention of purchasing Dalton, Dalton had no assets. As the jury found that Dalton stayed in business because it relied on Universal Truckload's promise, there was more than enough evidence for the jury to award $5.7 million in damages. We affirm the district court's denial of Universal Truckload's JMOL and affirm the jury verdict in Dalton's favor on its promissory estoppel claim and damages award.

### B.

The jury awarded Universal Truckload $1.9 million from Dalton arising from Dalton's unpaid shipping bill. But Universal Truckload waived its right to a jury on the question of whether that $1.9 million was spent in reliance on

13

Universal Truckload's promise to purchase Dalton.[3]  Under Federal Rule of Civil Procedure 49(a)(3), "the [district] court may make a finding on [any] issue" on which a party has waived its right to a trial by jury.  The district court found that the $1.9 million debt Dalton owed Universal Truckload was entered into entirely in reliance on Universal Truckload's promise of eventually purchasing Dalton.  Therefore, the damages were offset, and Dalton did not need to pay Universal Truckload $1.9 million.  Universal Truckload challenges the district court's finding.  "[I]mputed factual findings under Rule 49 are reviewed for clear error." *Heck v. Triche*, 775 F.3d 265, 282 (5th Cir. 2014).

Universal Truckload contends that the district court clearly erred because Dick Meredith—Dalton's owner—conceded at trial that it owed Universal Truckload the $1.9 million.  At trial, Meredith was asked, "If [the] jury determines that Universal Truckload is owed [the] $1.9 million, who should pay for it?"  To which Meredith responded, "Dalton should pay for it." Universal Truckload claims that this seals the deal.  Because the jury determined Dalton breached the contract, Dalton owes Universal Truckload $1.9 million.

However, this issue is not as open and shut as Universal Truckload believes it to be.  Whether Dalton breached its contract with Universal Truckload—the question the jury answered—is separate from the question the district court answered.  The district court found that Dalton entered into the $1.9 million contract solely in reliance on Universal Truckload's promise, and

---

[3] Prior to trial, Universal Truckload and Dalton had stipulated that $1.9 million was the amount owed.  Universal Truckload objected to the question of whether the debt was entered into in reliance on Universal Truckload's promises being submitted to the jury.  It argued that that question was unnecessary because the question of offsetting the $1.9 million could be sorted out later after the jury verdict on the reliance damages and breach of contract claims was settled.

therefore the damages offset each other.  And it is that finding that Universal Truckload appeals.  Meredith's statement at trial that "Dalton should pay" the $1.9 million was not a response to this separate question.  Meredith's statements at trial were in response to a line of questioning about which party, Dalton, H&P, or Hess, would owe Universal Truckload the $1.9 million if the jury found breach of contract.  Meredith's answer indicated only that Dalton, and not H&P or Hess, could be on the hook for that money.  It did not foreclose the finding that the $1.9 million contract was entered into in reliance on Universal Truckload's promise.

If Universal Truckload, instead of being the lender itself, had encouraged Dalton to borrow $1.9 million from a third party, these damages would be included in a straightforward reliance damage calculation.  *See Mistletoe Express Serv. v. Locke*, 762 S.W.2d 637, 638–39 (Tex. App.—Texarkana 1988, no writ) (explaining that a promisor is liable for any debts that a promisee incurred as a foreseeable consequence of the promise).  At trial, Cochran, one of Universal Truckload's witnesses, admitted that Dalton would not have incurred this debt if it closed in April 2013.  And as determined above, Dalton kept its doors open solely in reliance on Universal Truckload's promise that it would eventually purchase Dalton.[4]  Therefore, Dalton entered this $1.9 million debt in reliance on Universal's promise.

What makes this case appear tricky is that Universal Truckload wears two hats:  it is both the promisor and the lender.  But this does not affect our analysis.  As a lender, Universal Truckload is entitled to $1.9 million from Dalton under breach of contract.  And as a promisor, Universal Truckload owes Dalton $1.9 million because Dalton incurred this debt in reliance on Universal

---

[4] There is also evidence in the record that in April 2014, when Dalton had the money to pay this debt, Universal Truckload encouraged it to keep the cash to "keep [Dalton] going."

No. 17-20725

Truckload's promise.  The district court did not clearly err in finding that the $1.9 million arose out of Dalton's reliance on Universal Truckload's promise and therefore, it did not err in offsetting the damages.  We affirm the district court.

## C.

Universal Truckload also appeals the judgment in favor of H&P. H&P contracted with Dalton to broker transport of two disassembled oil rigs from Texas to North Dakota. Dalton retained Universal Truckload to transport the freight. Universal Truckload moved a part of the freight itself and subcontracted out the transportation of the remainder.  When Dalton failed to pay Universal Truckload for its services, Universal Truckload sued Dalton and H&P, arguing both parties were on the hook for the unpaid bill.

H&P prevailed in the district court. Universal Truckload and H&P filed competing motions for summary judgment. The district court denied Universal Truckload's motion and granted H&P's in part, dismissing Universal Truckload's claim that H&P was liable to Universal Truckload for the subcontracted loads.  The remaining question of H&P's liability for the loads Universal Truckload transported itself went to the jury. The jury rejected Universal Truckload's contract theory and found that H&P was not liable to Universal Truckload. After the verdict, Universal Truckload moved for a JMOL and the district court denied its motion. Universal Truckload now challenges: (1) the decision to send the contract question to the jury, (2) the denial of Universal Truckload's motion for summary judgment, and (3) the grant of summary judgment to H&P. We affirm the district court on all three issues.[5]

---

[5] Carried with this case is H&P's motion to dismiss for lack of appellate jurisdiction. H&P argues this court lacks appellate jurisdiction to decide two of Universal Truckload's claims against H&P. H&P first claims that we lack appellate jurisdiction to review Universal

No. 17-20725

1.

Universal Truckload contends on appeal that the district court judge, not the jury, should have decided whether H&P was contractually liable to Universal Truckload.  Universal Truckload asserts that the only question

---

Truckload's arguments about the jury question because Universal Truckload's notice of appeal was premature. Universal Truckload appeals from "[t]he District Court's Order of October 30, 2017 (the final judgment)," but final judgment was not entered against H&P until December 1, 2017. H&P argues that this premature notice of appeal deprives this court of jurisdiction. *United States v. Cooper*, 135 F.3d 960, 961 (5th Cir. 1998) (explaining a timely notice of appeal is necessary to exercise appellate jurisdiction).  However, *FirstTier Mortgage Co. v. Investors Mortgage Insurance*, 498 U.S. 269, 274 n.4 (1991), says that "a premature notice of appeal relates forward to the date of entry of a final 'judgement' . . . when the ruling designated in the notice is a 'decision' for purposes of [Rule 4(a)(2)]."

In a case similar to the one before us, the Eleventh Circuit reasoned that because "all of the claims had been decided as to all of the parties effectively ending the litigation on the merits" and the final judgment appealed from "would have been appealable if immediately followed by the entry of judgment on all counts of the complaint," the notice of appeal fell "directly within the language of [Federal Rule of Civil Procedure] 4(a)(2)" and the notice of appeal was considered timely. *Virgo v. Riviera Beach Assoc. Ltd.*, 30 F.3d 1350, 1356–57 (11th Cir. 1994). So here too. On October 30, when the district court entered final judgment on some of the issues, all questions regarding H&P had been resolved by the jury or ruled on by the court. Therefore, the notice of appeal falls within the language of Rule 4(a)(2) and we read the first designation of Universal Truckload's notice of appeal broadly to encompass the jury verdict and JMOL in H&P's favor. *Williams v. Henagan*, 595 F.3d 610, 616 (5th Cir. 2010) (explaining that this court "generously interpret[s] the scope of the appeal").

H&P correctly contends that this court lacks jurisdiction to review the district court's denial of a motion for summary judgment. We have previously said that "this court has jurisdiction to hear an appeal of the district court's legal conclusions in denying summary judgment, but only if it is sufficiently preserved in a Rule 50 motion." *Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 596 (5th Cir. 2017).  While Universal Truckload did make a Rule 50 motion re-urging the arguments made at the summary judgment stage, it specifically designated the denial of summary judgment for appeal. We interpret *Feld Motor Sports* to require not only that a Rule 50 motion is made, but also that the Rule 50 motion's disposition, not the denial of summary judgment, is what is appealed from. Despite the error in its notice of appeal, however, Universal Truckload could have been spared by our broad reading of the first designated order in its notice of appeal. Because Universal Truckload's first designation includes the denial of its JMOL, in which the summary judgment arguments were re-urged, we are not jurisdictionally precluded from reviewing, through the JMOL, the arguments that relate to denial of summary judgment. However, we do not reach the merits of this issue for another reason. Universal Truckload has forfeited this issue because its brief is silent on the denial of summary judgment and the JMOL. *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001) (explaining that a party forfeits an issue if it fails to adequately brief it). We therefore affirm the district court's denial of the JMOL regarding H&P.

remaining after the presentation of evidence was the effect of bills of lading Universal Truckload gave to H&P when it dropped off shipments. And because the effect of a legal instrument is a question of law, Universal Truckload contends that the district court erred by sending this question to the jury. *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) ("A trial court commits error if it submits a question of law to the jury."); *see also Tri-State Petroleum Corp. v. Saber Energy, Inc.*, 845 F.2d 575, 581–82 (5th Cir. 1988) ("The interpretation of a contract is a question of law . . . ."). Because Universal Truckload did not make a timely objection below, we review this issue for plain error. *Jimenez v. Wood Cty.*, 660 F.3d 841, 844–45 (5th Cir. 2011) (en banc).[6]

H&P disagrees with Universal Truckload's claim that the only relevant question was the effect of the bills of lading. It contends that an issue of fact— the parties' intent to be bound—remained. *See Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988) ("In some cases, of course, the court may decide, as a matter of law, that there existed no immediate intent to be bound. This case, however, is not such a case. The evidence as to the intent of the parties is disputed."). At trial, Universal Truckload conceded that it did not contact H&P before the transport of the rigs, that it did not send H&P a contract for the transportation of the rigs, and that it never told H&P that the bills of lading would function as a contract between the parties. Universal Truckload's business records, also presented at trial, indicated that Universal Truckload always intended Dalton to be responsible for paying for the

---

[6] Rule 51 of the Federal Rules of Civil Procedure requires a party objecting to an improper jury charge to (1) make a proper timely objection to the jury instructions, and (2) show that the instructions were legally erroneous. At the close of evidence, the district court judge asked the parties whether there were any objections to the jury questions. One of the jury questions asked "Did [H&P] contract for Universal Truckload to transport portions of rig 517 and 524?" Universal Truckload did not object to this question and therefore we review its claim for plain error. *Jimenez*, 660 F.3d at 844–45.

shipments.  Corey Lawyer, H&P's construction manager, also testified at trial about its understanding that the bills of lading function as receipts to show delivery, and not as contracts for payment obligations.  While Universal Truckload was free to argue to the jury that the bills of lading were a clearly binding contract, the jury was presented with evidence that called into question whether a true "meeting of the minds" occurred. The intent of the parties to be bound is an essential element of an enforceable agreement and is often a question of fact, as it appears to be here. *See id.* at 746.

Further, the jury charge—"Did [H&P] contract for Universal Truckload to transport portions of rig 517 and 524"—is language taken directly from the Texas Pattern Jury Charges.  The charge does not ask the jury to construe the effect of the bills of lading, but instead asks the jury to weigh the facts and determine whether H&P and Universal Truckload intended the bills of lading to be an enforceable contract.  The district court did not plainly err by sending this question to the jury.

### 2.

Universal Truckload's final argument regarding H&P is that the district court erred when it granted partial summary judgment to H&P on the outsourced loads. We review this *de novo. Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016). Universal Truckload paid subcontractors, but never got paid by Dalton. And, under a theory of equitable subrogation, Universal Truckload claims H&P should pay the subcontractors' bill. Because Universal Truckload's arguments fail as a matter of law, the district court's grant of summary judgment was proper.

Universal Truckload argues that it should have prevailed on its theory of equitable subrogation because it has non-voluntarily paid a debt—payment to subcontractors—that H&P was "primarily liable for" and that "in equity" H&P should have paid. "Equitable subrogation is the legal fiction through

which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which [another] was responsible." *Gen. Star Indem. Co. v. Vesta Fire Ins.*, 173 F.3d 946, 949 (5th Cir. 1999). It applies when "one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008) (quoting *Mid-Continent Ins. v. Liberty Mut. Ins.*, 236 S.W.3d 765, 774 (Tex. 2007)).

Universal Truckload's argument fails, however, because Universal Truckload's payment to the subcontractors was not actually non-voluntary, nor was H&P "primarily liable" for the payment. In *Frymire*, a subcontractor installed a faulty valve that caused damage to a property when a water line ruptured. *Id.* The subcontractor's insurance company paid for it, but then sued the valve manufacturer to recover this cost. *Id.* The valve manufacturer was liable because the damage was caused by the valve manufacturer's error through no fault of the subcontractor and therefore "in equity should have been paid by" the manufacturer. *Id.*

Here, Universal Truckload, on its own initiative, entered into a contract with third-party motor carriers to move a portion of H&P's freight. The contract specifically provided that the motor carriers would be paid by Universal Truckload.  Unlike in *Frymire*, where the subcontractor was supplied with a faulty valve, no error of another party created Universal Truckload's obligation to the subcontractor. Universal Truckload created its own, independent contractual obligation to pay the subcontractor. And, as the district court noted: "Universal [Truckload] specifically conditioned its contract with the motor carriers seeking payment exclusively from Universal Truckload. Payment under such circumstances cannot be characterized as involuntary."  Because Universal Truckload's payment to the subcontractors

was voluntary, Universal Truckload's equitable subrogation argument fails as a matter of law and was properly dismissed by the district court.

### D.

Finally, Universal Truckload appeals the district court's grant of summary judgment to Hess. The relationship between Universal Truckload and Hess resembles that of Universal Truckload and H&P. Hess is an oil and gas producer who has drilling operations in North Dakota. As part of its operations, Hess moves its rigs from one site to another. Hess entered into a contract with Dalton to coordinate the move of some of Hess's rigs. Dalton then entered into a subcontract with Universal Truckload to provide the trucks for Hess's move. Hess was not a party to the subcontract. Hess paid Dalton in full, but Dalton did not pay Universal Truckload. Universal Truckload sued Hess, as well as Dalton, to recover on the unpaid bills. Hess moved for summary judgment, arguing that it was not liable for the unpaid bills. The district court agreed, granted Hess's motion for summary judgment, and Universal Truckload appealed. Because there is no contractual relationship between Hess and Universal Truckload, we affirm the district court's grant of summary judgment.

Universal Truckload advances two legal theories supporting Hess's liability. First, Universal Truckload claims that Hess is contractually obligated to pay Universal Truckload for its services. Second, Universal Truckload argues that North Dakota's statutes and common law entitle Universal Truckload to recovery from Hess because Hess was the consignor of the loads.[7] Both arguments fail.

---

[7] Both Universal Truckload and Hess brief this issue under North Dakota law because all interaction between the two companies took place in North Dakota. As this case is before this court on diversity jurisdiction, and both parties agree North Dakota law applies, we interpret and apply North Dakota law here.

1.

Universal Truckload's first argument, that Hess is contractually obligated to pay Universal Truckload what Dalton owes, is unsupported by the record. The contracts at issue are: a Master Service Agreement between Dalton and Hess that Universal Truckload was not a party to and an agreement between Dalton and Universal Truckload that Hess was not a party to. As the district court correctly found, "there is no evidence that Hess ever knew of, received, accepted, or assented to the terms of any shipping contract with Universal [Truckload]."

Acknowledging no formal contract, Universal Truckload claims that bills of lading delivered to Hess at the time of shipment contractually bind Hess and Universal Truckload. However, Universal Truckload does not adequately demonstrate this on appeal. The sole support for its contention that there are binding bills of lading is a citation to two hundred pages of the record. This portion of the record purportedly contains bills of lading between the two companies, but the cited page span includes numerous bills of lading between multiple companies. Universal Truckload does not point to a single bill of lading that was for a shipment to Hess relevant to this case. We have no obligation to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n.7 (5th Cir. 1992)). Therefore, the alleged bills of lading referenced in Universal Truckload's brief are insufficient to support Universal Truckload's argument.

Even if we were to look past Universal Truckload's insufficient briefing and comb through the record, there is nothing in the record that indicates the prepared bills of lading were actually given to Hess. Dalton's president, Dick Meredith, testified in his deposition that "there [is] no way of knowing" on many bills of lading whether it was a shipment for Hess, H&P, or one of

Universal Truckload's other clients. He also explained that bills of lading are often prepared exclusively for payroll and not actually given to the receiver. He testified that one could not know on the face of the bill of lading whether it had been given to the recipient. Thus, the district court correctly determined that because "there is no evidence that Hess ever knew of, received, accepted, or assented to the terms of any bill of lading" Universal Truckload's breach of contract claim fails.

2.

Universal Truckload's second theory of recovery also falls short. Universal Truckload claims that even without an express contract between Hess and Universal Truckload, Hess is liable for the unpaid shipping costs under North Dakota law. Universal Truckload contends that specific provisions of the North Dakota Century Code "codified the common law doctrine that the consignor and consignee remain liable to the carrier absent a contrary agreement."

The relevant provisions of the Century Code are as follows:

> **§ 8-05-02. Consignor liable for freightage:** The consignor of freight is presumed to be liable for the freightage, but if the contract between the consignor and the carrier provides that the consignee shall pay it and the carrier allows the consignee to take the freight, the carrier cannot afterwards recover the freightage from the consignor.

> **§ 8-05-03. Consignee liable for freight**: The consignee of freight is liable for the freightage if the consignee accepts the freight with notice of the intention of the consignor that the consignee should pay it.

N.D. Cent. Code §§ 8-05-02, -03. As Universal Truckload understands it, section 8-05-02 controls here because Hess is the "consignor" and must pay Universal Truckload's freight charges, because there existed no "contract between the consignor (Hess) and the carrier (Universal [Truckload]) that

provides that" another party should pay. Universal Truckload also argues that under section 8-08-03 Hess was the "consignee" and because Hess accepted the shipment, Hess must pay for it.

Hess disputes this reading of the statute and explains that these provisions were intended to allocate liability between three separate parties: a "consignor" (the sender), a "consignee" (the recipient), and a carrier. That is not the type of transaction at issue in this case. Here, we have Dalton (a carrier) who subcontracted a service from Universal Truckload (a third-party subcontractor) to ship goods to and from a single entity—Hess. In this case, Hess is the consignor *and* the consignee. These sections cannot be read to establish liability in favor of a third-party subcontractor such as Universal Truckload, as they do not even contemplate the existence of such a third party. Contrary to Universal Truckload's contention, these provisions do not create a default rule that the consignee is always liable to the party who delivers goods.

Universal Truckload cites a single case it believes supports its reading of North Dakota law: *E.W. Wylie Corp. v. Menard, Inc.*, 523 N.W.2d 395 (N.D. 1994).[8] Universal Truckload contends that *Wylie* established a common law rule that carriers may seek payment from either the consignor or consignee. But *Wylie* expressly reached the opposite conclusion. The Supreme Court of North Dakota explained that the appellant in *Wylie* "overstate[d] the common law" when it argued that a consignor and consignee of shipped goods are

---

[8] In *Wylie*, Menard, a consignee/receiver, purchased lumber from IKA, a consignor/shipper. *Id.* at 397. The contract between IKA and Menard established that IKA would pay the freight charges to the carrier. *Id.* IKA then contracted with a carrier, E.W. Wylie Corp., to transport the lumber, and the contract provided that IKA would pay. *Id.* Menard paid IKA, but IKA never paid Wylie. After Wylie unsuccessfully sought payment from IKA, it attempted to recover from Menard. *Id.* The Supreme Court of North Dakota held that Menard was not liable to Wylie for IKA's unpaid bills because there was no contract between Wylie and Menard and there was a contract between Wylie and IKA. *Id.* at 397, 406.

always jointly and severally liable for a carrier's freight charges. *Id.* at 397. "[B]ecause liability for payment of freight charges is largely a matter of contract, any common law presumption about responsibility for freight costs may be rebutted by evidence that the parties intended something else." *Id.* at 399. In *Wylie*, the "something else" was a contract between the carrier and the consignor that expressly stated the consignor would pay the carrier. *Id.* Here, it is the contract between Universal Truckload and Dalton that expressly states Dalton would pay Universal Truckload. Even if there were a common law presumption regarding the obligation of a consignee to pay a third-party contractor that it has no contractual relationship with, the contract between Universal Truckload and Dalton would rebut that presumption.

Nothing in the North Dakota common law or Code allows Universal Truckload to overcome its lack of contractual agreement with Hess. Accordingly, we affirm the district court's grant of summary judgment in Hess's favor.

## III.

The district court correctly denied the JMOL asking the court to reverse the jury's finding that Dalton was entitled to $5.7 million in reliance damages under promissory estoppel. Further, the district court correctly concluded that the $1.9 million breach of contract damages in Universal Truckload's favor should be offset because the debt arose from reliance on Universal Truckload's promise. Finally, the district court also correctly determined that neither H&P nor Hess was liable for the shipping charges Universal Truckload incurred. We therefore AFFIRM the judgment in full.